ERNEST CAMREN et al., Respondents, v. COLIN S. SQUIRES, Appellant.

St. Louis Court of Appeals. Argued and Submitted April 10, 1913. Opinion Filed May 6, 1913.

1. **APPELLATE PRACTICE: Disposal of Case: Theory in Trial Court.** A case will be disposed of, on appeal, on the same theory upon which it was tried by the trial court and the parties litigant.

2. ————: **Conclusiveness of Findings: Equity Case.** Findings of fact by the trial court in an equity case, while persuasive, are not conclusive on the appellate court.

3. **PRINCIPAL AND AGENT: Authority of Agent: Sufficiency of Evidence.** In an action for damages alleged to have been sustained as a result of alleged fraudulent misrepresentations of a real estate agent, relating to the exchange of properties

between plaintiff and defendant, evidence *held* to show that the real estate agent was plaintiff's, and not defendant's, agent in the transaction.

4. **FRAUD AND DECEIT: Fraudulent Misrepresentations: Sufficiency of Evidence.** In an action for damages alleged to have been sustained as a result of alleged fraudulent misrepresentations of a real estate agent, relating to the exchange of properties between plaintiff and defendant, evidence *held* to fail to show that misrepresentations were made.

5. **PRINCIPAL AND AGENT: Fraud and Deceit: Misrepresentations of Agent for Both Parties.** A party to a transaction cannot recover against the other party for damages resulting from the fraudulent misrepresentation of one who is agent for both parties, where such other party practices no concealment and gives every opportunity to investigate the condition of the matter concerning which the representation was made.

6. **HUSBAND AND WIFE: Principal and Agent: Agency of Husband: Acts Binding on Wife.** Where a husband and wife together owned a farm and the wife made the husband her agent for its sale, she was bound by his negligence in effecting an exchange thereof, and hence, although the property taken in lieu of it was of much less value, she was not entitled to recover.

Appeal from Bollinger Circuit Court.—*Hon. Peter H. Huck*, Judge.

REVERSED.

*Wm. M. Morgan* and *Anthony & Davis* for appellants.

(1) Plaintiffs were not deceived by Squires or Smith, nor was any fraud practiced in order to obtain title to their land. So far as the two properties were concerned, after clearing mortgages and liens, there was practically no difference in value between them. (2) Even though it should be conceded that the Camrens were cheated in the trade, they bought with their eyes open. They had the opportunity to invoice, investigate and ascertain the value of the restaurant, its stock, invoices, daily sales, expenses, profits, etc.

Having failed to do these things in the face of the opportunity offered, they now have no standing either in a court of equity or court of law. Founding & Foundry Co. v. Heskett, 125 Mo. App. 516; Wade v. Ringo, 122 Mo. 322; Lewis v. Land Co., 124 Mo. 672; Jones v. Rush, 156 Mo. 364. (3) Camren was an experienced merchant, more so than either Smith or Squires. He made such investigation of the business at Jackson as he wished. He was invited to inspect the stock, invoices, sales, etc., and was told where he could find the books. He made the trade with information before him which was satisfactory to him, and with the opportunity to acquire all further information. Under these circumstances he has no standing in either a court of equity or law. Davis v. Ins. Co., 81 Mo. App. 264; Cahn v. Bungardt, 18 Mo. App. 115; Bradford v. Wright, 145 Mo. App. 623; Jones v. Rush, 156 Mo. 364; Snider v. McAtee, 165 Mo. App. 260; Stratton v. Dudding, 147 S. W. 516. (4) This being an action in equity, this court will review all the testimony, will practically try it de novo and will render such judgment, or direct same to be rendered by the nisi prius court, as may be justified by the evidence. Plumber v. Knight, 156 Mo. App. 321; Lacks v. Bank, 204 Mo. 455; Carpenter v. Roth, 192 Mo. 658; Welch v. Mann, 193 Mo. 304; Williams v. Husky, 192 Mo. 533. (5) This being an action against defendants as partners, the court, after finding they were not partners, was not authorized by the pleadings to render judgment against defendant Squires. Hagar v. Graves, 25 Mo. App. 164; Bank v. Harris, 54 Mo. App. 156; Anable v. Land Co., 144 Mo. App. 303. (6) The court was not authorized by the pleadings or evidence to render separate judgments for different amounts in favor of each plaintiff and against one of the defendants, Squires. Pattison's Missouri Code Pleading (2 Ed.), sec. 125. (7) Even though Smith may have

exaggerated the value of the restaurant business, for the purpose of enhancing the value of that property in the eyes of Camren, this would not have been a fraud. It being convenient and easy for Camren, by the exercise of ordinary prudence, to have ascertained the value of the restaurant business, it was his duty to form his own opinion and act on his own judgment. Founding & Foundry Co. v. Heskett, 125 Mo. App. 516; McFarland v. Railroad, 125 Mo. 253; Bank v. Hunt, 76 Mo. 439; Anderson v. McPike, 86 Mo. 293; Cornwall v. Real Estate Co., 150 Mo. 377; Jones v. Rush, 156 Mo. 364; Bank v. Hunt, 76 Mo. 445.

*Edw. D. Hays* for respondents.

(1) Defendants contend that in buying the restaurant the Camrens were put on their own inquiry and therefore they ought not to complain if they were cheated. (a) But it is the law that where fraudulent representations are made to induce a trade, or where the parties do not stand on an equal footing as to the knowledge of the facts concerning the value of the property, equity will interpose to relieve an innocent party against the wiles of an unscrupulous trader who obtains an advantage over him by fraud, whether by positive falsehood, or by the suppression of the facts which he ought in conscience to make known. Gottschalk v. Kircher, 109 Mo. 170; Cottrill v. Krum, 100 Mo. 397; Grigsby v. Stapleton, 94 Mo. 423; Pomeroy v. Benton, 57 Mo. 531; Florida v. Morrison, 44 Mo. App. 529; Derby v. Donahoe, 208 Mo. 684. (b) Where a person knowingly or recklessly makes misrepresentations of material facts for the purpose of inducing another to enter into a contract, and such person, in reliance upon such misrepresentations, enters into a contract and sustains loss, an action for deceit will lie. 20 Cyc. 44; Florida v. Morrison,

44 Mo. App. 529; Arthur v. Wheeler & Wilson, 12 Mo. App. 335; Jude v. Walker & Naxers, 215 Mo. 312. (c) The vendee of a stock of goods may maintain deceit against the vendor for a false representation of the amount of current sales where the circumstances are such that the vendee relied upon the representation of the vendor and was not shown the books of the concern. 20 Cyc. 56; Biglow on Frauds, 68; Hess v. Draffen & Co., 99 Mo. App. 580; Alexander v. Wade, 107 Mo. App. 321; Brolaski v. Carr, 127 Mo. App. 279. (2) Defendant Squires is liable even though Smith was not a partner as he represented himself to be, but was merely an agent. (a) When a fraud is perpetrated by an agent on a third party in the course of his employment and for the benefit of the principal, knowledge of the fraud must be imputed to the principal; and where the principal avails himself of the benefit of the fraud, the principal is liable. Darks v. Grocer Co., 146 Mo. App. 246; Plummer v. Knight, 156 Mo. App. 321. (b) Where one of two parties stands by and remains silent while the other sells goods and makes false representations concerning it, which induce a sale, he becomes as much a party to the misrepresentations as if he himself had made them and he is liable. 20 Cyc. 86; Judge v. Walker & Naxera, 215 Mo. 312. (3) In point 9 of his brief appellant complains that the court refused the declarations of law asked by the defendants. Actions in equity are not triable on instructions or declarations of law. This is an equity proceeding. Florida v. Morrison, 44 Mo. App. 529; Bishop v. Seal, 87 Mo. App. 256; Johnson v. Burks, 103 Mo. App. 221.

REYNOLDS, P. J.—It is claimed that this is a suit in equity. The petition avers that plaintiffs being the owner of certain described real estate in Bollinger county, this State, were induced to exchange

that real estate for a business carried on by defendants Smith and Squires in Jackson, Cape Girardeau county, under the name of Colin S. Squires & Co. That business was the conducting and operation of a restaurant and ice cream concern, and it is alleged that defendant Smith was a partner at the time of the exchange of the properties and so represented himself to plaintiffs; that Smith represented that the firm had owned and operated the business for a period of about seventeen months; that the patronage of the firm and the business had gradually increased from the time it was established in January, 1908, to the month of May, when the deal was on for the exchange of this restaurant business for the farm; that it was becoming larger and more profitable; that the gross sales of the firm in the business during the seventeen months had averaged $1000 a month, a daily average of $33.33 1-3; that relying entirely upon these representations of the defendant Smith, the trade had been made, it being agreed that Smith and Squires would pay plaintiffs $400 in money, the difference between the $2600 and the value of the farm, $3000. It is charged that all these representations of Smith as to the value of the business were false and made with the intent to deceive the plaintiffs; that plaintiffs had acted on these representations, had relied entirely upon the good faith and integrity of Smith and had trusted him implicitly as to these representations being true; that after making the exchange and taking over the business plaintiffs found that these representations as to the value of the business and as to the amount of the sales and profits were grossly false; that in truth and in fact the gross sales amounted to an average of about $707.10 per month, a daily average of $23.57, and that instead of the business increasing since January, 1908, it had been gradually falling off; that the $400 difference between the $2600 valuation at which plaintiff had taken the business and $3000,

the value of the farm, had never been paid plaintiffs by either of the defendants, and that defendants had furthermore failed to deliver and turn over to plaintiffs articles pertaining to the business, of the value of $126, and which articles were included in the sale. Judgment was prayed for the $400; and for the value of the articles not delivered and averring that the total loss of plaintiffs in the transaction was $2000, judgment was asked for that amount and that a vendor's lien be affixed on the real estate which plaintiffs had conveyed to the defendant Squires in exchange for the restaurant business.

Denying all the allegations of fraud or deceit, defendants denied that they were partners at the time of the transaction or had any joint interest in the restaurant business; denied that the real estate was taken in exchange at the valuation of $3000 but aver that the exchange of the real estate, a part of which belonged to the husband and part to the wife, was on an even trade of that for the restaurant business, both being valued at $2600; denied that defendants or either of them had sold the restaurant business for $2600, or any other sum, but aver that the transaction was an even exchange between plaintiffs and the defendant Squires, the restaurant business exchanged for the land, plaintiffs also agreeing to take care of certain judgments which were against the plaintiff Ernest Camren, and a lien on his land, and also to clear the land of an incumbrance amounting to some $216, evidenced by a deed of trust.

A reply was filed to the answers and the cause submitted to the court without the intervention of a jury, both parties as well as the court agreeing to try the case as one in equity. At the conclusion of the trial the court, after taking the cause under advisement, entered a decree discharging the defendant Smith from all demands of plaintiffs and rendering judgment in his favor. It was further adjudged and

decreed that the plaintiff, Ernest Camren, have and recover of the defendant Squires $96.87 and his costs and charges, as his proportionate share in the $126 found to be the value of articles contracted to be turned over to plaintiffs but not delivered, and that execution issue therefor, to be levied on the real estate of the defendant Squires, which land was charged with a vendor's lien for that amount in favor of Ernest Camren. It was further adjudged and decreed that the plaintiff, Cora Camren, wife of Ernest Camren, have and recover of the defendant Squires the sum of $399.13, and her costs and charges and that execution issue therefor, to be levied out of the real estate which had belonged to her, that land being charged with a vendor's lien for that amount.

A motion for new trial was filed by defendant Squires and exception saved to the action of the court in overruling it. Whereupon Squires duly perfected his appeal to this court.

Without expressing an opinion as to whether this is a suit in equity or an action at law, or as to whether plaintiffs could join in this action, we have concluded to dispose of it on the theory upon which it was tried by the trial court and by counsel for the respective parties. We have accordingly read all the testimony in the cause with very great care. We have before us, not only all the testimony, but a memorandum filed by the learned trial judge in connection with his decree. While that memorandum is not binding upon us, it has proved a great aid in getting at the theory upon which the trial court handled and disposed of the case.

Treating the case as one in equity, while the conclusion of facts arrived at by the trial court is persuasive, it does not conclude us. We have arrived at our own conclusions in the case from a very careful examination and consideration of the testimony. It may be said that in considering the testimony, we are governed somewhat by the fact that the reputation

of the plaintiff Ernest Camren for truth and veracity was very seriously assailed by several witnesses. We are unable to say how far this controlled the trial court, but we have that evidence before us and the witnesses who gave it are all neighbors, evidently men of standing in the community whose characters are in no way impugned or assailed. For that matter, no attempt whatever was made to question the general reputation and character for truth and veracity of either of the defendants. We are also determining the credibility of the testimony of the plaintiff Ernest Camren in great measure by that testimony itself, applying to it the test as to its probability. His wife also testified, as did his aged mother. But it is so evident that all of any importance they testified to, and it was not much, came to them from the husband and son, that it is hardly worth considering.

The learned trial court found that defendant Smith was acting in the transaction as the agent of defendant Squires. We have not reached that conclusion. It appears that defendant Smith, among other occupations, was a real estate agent, and that he had been approached by the plaintiff Ernest Camren to make a sale or procure a trade for him for the farm which he and his wife owned and on which they resided. Mr. Smith testified that at the close of the transaction Mr. Camren paid him $125, as commission for effecting the trade, five per cent on the agreed valuation between them of the farm, that is $2500. He paid it by check, which apparently was cashed by Smith. Mr. Camren's explanation of this is that he loaned Mr. Smith this money on his promise that he (Smith) would repay it within a few days. Smith never repaid it and there is no specific testimony on the part of Mr. Camren that prior to giving his testimony in this case he ever intimated in any way that Smith owed him $125 for borrowed money. The nearest he comes, when pressed to state whether he

had ever demanded this amount back from Smith, is
to say that he "asked him (Smith) to comply with
his part of the contract." That can hardly be con-
strued into a demand for this money which, according
to Camren, had nothing to do with the trade. Most
certainly he did not include this item of $125 in the
petition in this cause, nor seek to recover it here. Con-
sidering the whole testimony, that of Camren and
Smith in this transaction and bearing in mind the ex-
planation of both parties to the matter, we can come
to no conclusion but that Smith in this trade is to be
considered the agent of plaintiffs. There is not a
particle of testimony that he was acting as agent for
Squires. We are confirmed in this view of the case
by the fact that there is no testimony whatever in it
tending to show that prior to his entering upon the
matter with Camren, Smith had any agency, employ-
ment or authority from Squires to sell or trade for
the restaurant. Squires, it appears, was the brother-
in-law of Smith and had gone into this restaurant
business originally with Smith, but about four months
after it was started Smith had sold out his interest to
a young man named Allen. How long Squires and
Allen continued in copartnership, does not appear. It
does appear that when the trade was made between
Squires and the Camrens, Squires alone acted,
although the firm name of Colin S. Squires & Company
was still used in the business. It is also in evidence
that Allen was present when Camren visted Jackson
to examine the business. Smith knew that Squires
wanted to get out of the business and return to his
original occupation of railroading, as a contractor,
but apparently he did not know, until he went to Jack-
son with Camren and brought the two men together,
that Squires would entertain a proposition to exchange
his restaurant for a farm. What he did know was
that Squires wanted to quit the restaurant business.
Beyond all doubt Camren was the one who first ap-

proached Smith. He called on him at his business office in Marble Hill or Lutesville, it is not clear at which place—at all events in one or the other place, in Bollinger county—and told Smith he wanted to sell out or get out of that neighborhood, where he appeared to have been in trouble with some of his neighbors. His mother and wife both testified that they feared for his life there and were afraid to have him leave the house. Smith told him he probably could get a trade for him of a farm in another part of the county. Camren objected to this as too far off. Smith then told him that his brother-in-law, Squires, had this restaurant business at Jackson which he wanted to get rid of, but he did not say that Squires would trade it. Camren made no definite answer and went home. Two or three days after this talk between Smith and Camren, Smith was told by some neighbors that Mr. Camren said he wanted him to come out and see him; that they would go ahead and see if they could make the trade of the farm for the restaurant. The Camren farm was some eight or nine miles from Marble Hill and Smith went out and he and Camren went over the farm and Camren stated that his price was $2500; that he ought to have $4000 but under the circumstances he would take $2500. Smith told the Camrens about the restaurant; what he thought of it. They accordingly agreed to meet and go to Jackson together, which they did. Arriving there in the afternoon, Smith introduced Camren to Squires and left them to themselves to talk the matter over. Camren stayed at the restaurant all the evening of that day and until ten o'clock at night, when it was closed. During that evening and the next morning until train time, Camren, either in company with Squires or with Allen, went all over the premises and examined the contents, Allen pointing out to Camren certain articles of Squires or of Mrs. Squires and which were not to be included in the proposed sale.

The concern kept the usual books, journals or day books, and ledgers, and also had a book in which a complete inventory of all the property on hand belonging to the business was kept. These books were all in the restaurant while Camren was there and no attempt was made to conceal them from him or prevent him access to them. They were not offered to him, nor shown to him, nor referred to, as he made no inquiry whatever concerning them and never asked to see them. Camren did not ask if an inventory had been taken, contenting himself with his personal examination of the articles on hand, and as he says with what Smith had told him about the business. He had been in the restaurant practically all of the afternoon and until late at night and for some time the following morning, and had an opportunity to observe the business, but made no inquiry as to the daily sales or expenditures or for particulars of the stock on hand. He had, for a time, been a school teacher, had also kept a country store, and was a farmer; about forty years old; an intelligent man. He testified, when first asked as to why he had made no inquiry as to any of these matters, that when he and Smith were on the train going from Lutesville to Jackson, Smith had said to him that he did not want him (Camren) to ask any questions concerning this business "before anyone." He subsequently varied this by saying that Smith had told him not to ask anybody at all about the business and not to ask any questions of anyone about it. This is so improbable and contrary to all dealing between men of ordinary business sense that we do not believe it. To accept Camren's statement as broadly as he made it, he would have been excluded from asking any questions even of Squires or Allen or of anybody connected with the business. It is impossible to believe that even if Smith had made any such suggestion to him, it would not at once have excited the suspicion of himself or of any man as to

the good faith or truthfulness of Smith's statements concerning the business, upon which statements Camren says he was entirely relying in making the trade; that too, when he testified that he took Smith then to be a partner of Squires in the business, interested in the trade and acting for himself (Smith) and Squires. At all events, after having inspected the business as far as he thought necessary at the time, and having every opportunity to make the fullest inquiry, he and Smith left Jackson together, Squires testifying that nothing very definite had been mentioned about any trade that evening or that night but that the next morning Camren, Allen and Smith were together and he (Squires) told Camren about the business of the restaurant; does not know that they went into details; took him all over the building. Squires asked him if he (Camren) wanted to take an invoice of the stock, and Camren said, "No," that it was not necessary; that he had been over the business and that Allen had showed him and he was satisfied. Introducing Camren to Squires as the man he had told Squires about, Smith turned the matter over to them to work out together. After these two had talked it over, Smith said he did not see any reason why they could not trade, and asked them if they could "get together on a trade." Squires told Camren that they had made an invoice, a complete one, about the 1st of January, 1909, and that the invoice showed there was between $2500 and $2600 of stock and fixtures on hand. He did not show him the invoice because Camren did not ask for it. Camren asked nothing as to the total sales, or the expenses of running the business. No agreement of any kind was reached at this meeting between Squires and Camren and, as Squires testified, and in this he is in no manner contradicted, when Camren left the next morning he (Squires) did not know that any trade was going to be made. All the proposition that had been discussed between him and

Camren was that it was to be an even trade, if one was made, the restaurant for the farm. What he and Camren were both interested in knowing was whether there was any money to be paid in by either side as difference, but it was agreed that if a trade was made it was to be an even trade. Camren and Smith left the next morning, apparently returning to Bollinger county. Whether they went together or separately is not very clear.

A few days after they had been to Jackson, Camren came in to see Smith and told him that he had decided to make the deal; that he had talked it over with his wife and they had decided to go on with it. Smith said, ''When are you going back to make an invoice?'' Camren said that he did not care to make an invoice. Whereupon Smith said to him that he must understand that everything did not go in with that stock, that some of the things upstairs belonged to Mrs. Squires, to which Camren said that he understood, and Smith then asked him when he wanted to make the deal, and he said, ''Right away.'' Asked about the title to his land Camren told him it was all right and Smith then asked him who would make the deed. Camren said he supposed he would have some justice of the peace make it and take the acknowledgment, to which Smith said that he would rather go out and take the acknowledgment himself and then he would know it was in right shape, but he said to Camren that he did not want to go to the trouble to prepare the deed and drive out to his (Camren's) place the next day and they ''all be out of the notion'' of making the deal. In answer to which Camren told Smith to come out the next day and the deed would be signed up. Smith testified that he wrote up the deed for the farm the next morning before he started, putting the consideration as $3000 and the land as 183 acres and a fraction, which was incorrect, as there were only 173 acres. He went out to Camren's house,

talked with Camren and his wife, and told the latter he had come to close up the deal for the farm. She asked him something about the business and he told her what he thought about it and they accordingly executed the deed which was afterwards delivered to Squires, Camren and his family moving into Jackson and taking possession of the restaurant and running it for a short time. To secure Squires against some judgments against Camren and a lien on the land, Camren gave a chattel mortgage on the restaurant and it appears that either under this, or under executions that were running against Camren, the property in the restaurant was sold. This is about the version of Smith and Squires.

Mr. Camren and his wife testified in the most positive terms that Mr. Smith had stated that he was a partner with Squires and that the articles in the restaurant invoiced at $2500; that it was a money-making concern; that the sales averaged about $1000 a month and were growing better, and that it was in implicit reliance on these statements, which they claim were false, that they consummated the deal.

We cannot, on consideration of all the evidence in the case, accept this as true. Even if they were, they were made by a man the Camrens believed to be acting for himself and for Squires and they had no right, as prudent people, to accept them without any investigation. They were afforded every opportunity to investigate conditions. No concealment was practiced or attempted. If they chose to shut their eyes, they must abide the consequences.

The learned trial court found that Smith, while acting as agent for Squires, was not his partner and not responsible in any amount to the Camrens; that the agreed consideration or the purchase price of the farm was $2600 and not $3000, as contended by plaintiffs; that the reasonable value of the restaurant, including the entire belongings thereto, was $1000;

and the reasonable value of the land $2600; that the reasonable value of the articles that Squires failed to turn over to the Camrens was $126. The trial court further found that Smith was the agent of Squires and while he had asked Camren not to make an investigation and that he should rely on Smith's statements as to the value, that according to the evidence Camren went to Jackson to examine the restaurant as well as the books and stayed there long enough to make a thorough examination; that he made no investigation, much less such an investigation as a reasonable man would make when an opportunity presented itself and that from all the evidence the trial judge held that he was persuaded that Camren purchased or traded for the restaurant with his eyes open and that if he was cheated he alone was to be blamed and therefore he is not entitled to any judgment in the case against either of the defendants. It is a little difficult to reconcile the ultimate finding with the facts found. But we agree with the conclusion arrived at by the trial court that Camren purchased with his eyes open and that if he was cheated he was to be blamed and could not recover.

But with this finding the learned trial court found, that treating this as an action in equity, and that while it was to be admitted that her husband acted as her agent in the transaction, it is clear from the evidence that the wife relied upon and acted under the persuasion of her husband. Acknowledging the rule of law that if an agent is derelict in his duty and the principal thereby suffers loss or damage, that the agent is responsible to the principal, the learned trial court concluded that it felt, from an equitable standpoint, that Ernest Camren being the husband of Cora had induced her to part with her separate property and that she is in no position to receive from him the amount for which she was damaged by the trade. The court therefore concluded that under the circumstances

and that right and justice may·be done to all parties, Mrs. Camren is entitled to 40/173 parts of the difference in the value of the restaurant and the farm and to that percentage of the property not turned over. We are compelled to differ with the learned trial court on this conclusion, and have been referred to and know of no adjudged case that so holds. Nor are we able to sustain it on principle. Beyond all question the wife acted in the transaction through the persuasion and inducement of her husband and constituted him her agent in the transaction. As he was guilty of gross negligence in the transaction of that business, as is conceded by the court, and closed his eyes to facts that were not attempted to be concealed from him, it is impossible for us to agree with the trial court that this absolves Mrs. Camren from liability for his negligent acts as her agent.. Most certainly we cannot agree that for this negligence of the agent of the wife the defendant Squires is to suffer. So concluding, puts an end to this case. On no principle of equity that we are aware of is the wife entitled to the recovery of her proportionate part of the loss as against the defendant Squires.

It follows that the finding and judgment of the circuit court must be set aside and the judgment in the cause reversed. It is so ordered. *Nortoni* and *Allen, JJ.,* concur.